# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATILIS GYM BELLMAWR, LLC, | Hon. Robert B. Kugler, U.S.D.J. |
| Plaintiff, | CIVIL ACTION NO. 1:20-CV-6347-RBK-KMW |
| v. | |
| PHILIP D. MURPHY, in his official capacity as the Governor of the State of New Jersey; GURBIR S. GREWAL, in his official capacity as Attorney General of the State of New Jersey; PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police and as State Director of Emergency Management, and JUDITH M. PERSICHILLI, in her official capacity as Commissioner of the New Jersey Department of Health, | **CIVIL ACTION**<br>**(ELECTRONICALLY FILED)** |
| Defendants. | |

## BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Jeremy M. Feigenbaum
Daniel M. Vannella
Michael C. Walters
Assistant Attorneys General
    Of Counsel and on the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 116
Trenton, New Jersey 08625
*Attorney for Defendants*

Deborah A. Hay
Bryan Edward Lucas
Robert J. McGuire
Jessica Jannetti Sampoli
Michael R. Sarno
Deputy Attorneys General
    On the Brief

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY .............3

    A.  COVID-19's Spread and Devastating Impact on New Jersey .................3

    B.  New Jersey's Actions to Combat COVID-19 in New Jersey .................5

    C.  Plaintiffs' Violations of the EO and Subsequent Proceedings ..............10

STANDARD FOR PRELIMINARY INJUNCTION .............................................15

ARGUMENT.............................................................................16

    I.      PLAINTIFFS WILL NOT SUCCEED ON THE MERITS ..............16

        A.     This Court Must Abstain From Hearing This Case ................16

        B.     Plaintiffs' Claims Fail on the Merits .......................................22

           i.  Due Process Clause (Count I)  ...........................................22

           ii.  Equal Protection Clause (Count II)  ...................................28

           iii.  Takings Clause (Count III) ................................................31

           iv.  New Jersey Constitution ...................................................35

    II.     THE  REMAINING  FACTORS  MILITATE  AGAINST GRANTING PRELIMINARY INJUNCTIVE RELIEF...................36

CONCLUSION ..................................................................................39

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ............................................................................15

*AmeriSource Corp. v. United States*,
    525 F.3d 1149 (Fed. Cir. 2008) ......................................................................32

*Alvin v. Suzuki*,
    227 F.3d 107 (3d Cir. 2000) ............................................................................27

*Ass'n of N.J. Rifle & Pistol Clubs v. AG of N.J.*,
    910 F.3d 106 (3d Cir. 2018) ............................................................................32

*Benner v. Wolf*,
    20-775, 2020 WL 2564920 (M.D. Pa. May 21, 2020) ................................36, 38

*Best Supplement Guide, LLC v. Newsom*,
    20-965, 2020 WL 2615022 (E.D. Cal. May 22, 2020) ............................*passim*

*Bi-Metallic Investment Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ........................................................................................26

*Chi., B. & Q. R. Co. v. Ill.*,
    200 U.S. 561 (1906) ........................................................................................32

*Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*,
    13-144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013) ....................................15, 16

*D.C. Ct. of Appeals v. Feldman*,
    460 U.S. 462 (1983) ........................................................................................17

*Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*,
    19-8828, 2019 WL 1519026 (D.N.J.2019) ....................................................37

*First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*,
    482 U.S. 304 (1987) ........................................................................................34

*Gonzalez v. Waterfront Comm'n of N.Y. Harbor,*
    755 F.3d 176 (3d Cir. 2014) ....................................................................18, 19

*Hartman v. Acton,*
    20-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) ...........................26, 27

*Hill v. Borough of Kutztown,*
    455 F.3d 225 (3d Cir. 2006) ..............................................................................23

*Huffman v. Pursue, Ltd.,*
    420 U.S. 592 (1975) ..........................................................................................19

*Infinity Broadcasting v. Meadowlands Comm'n,*
    901 A.2d 312 (N.J. 2006) ..................................................................................12

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ............................................................................................22

*Joey's Auto Repair & Body Shop v. Fayette Cty.,*
    785 F. App'x. 46 (3d Cir. 2019) .......................................................................23

*King v. Christie,*
    981 F. Supp. 2d 296 (D.N.J. 2013) ...................................................................35

*Kos Pharms. Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004) ..............................................................................15

*L.A. v. Hoffman,*
    144 F. Supp. 3d 649 (D.N.J. 2015) ...................................................................28

*Lane v. New Jersey,*
    725 F. App'x 185 (3d Cir. 2018) .......................................................................16

*Leib v. Hillsborough Cty. Pub. Transp. Comm'n,*
    558 F.3d 1301 (11th Cir. 2009) .........................................................................24

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ..........................................................................................34

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) ..........................................................................................26

iii

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992) ...................................................................................32

*Malhan v. Sec'y U.S. Dep't of State*,
    938 F.3d 453 (3d Cir. 2019) ................................................................16, 17

*Maryland v. King*,
    567 U.S. 1301 (2012) ...................................................................................38

*Medeiros v. Vincent*,
    431 F.3d 25 (1st Cir. 2005) ..........................................................................24

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982) .....................................................................................20

*Moore v. Sims*,
    442 U.S. 415 (1979) .....................................................................................19

*Mugler v. Kansas*,
    123 U.S. 623 (1887) .....................................................................................32

*Newark Cab Ass'n v. City of Newark*,
    901 F.3d 146 (3d Cir. 2018) .........................................................................29

*Nat'l Amusements Inc. v. Borough of Palmyra*,
    716 F.3d 57 (3d Cir. 2013) ...........................................................................33

*Nicholas v. Pa. State Univ.*,
    227 F.3d 133 (3d Cir. 2000) .........................................................................23

*Pharmacia Corp. v. Alcon Labs.*,
    201 F. Supp. 2d 335 (D.N.J. 2002) ..............................................................37

*Raygor v. Regents of the Univ. of Minn.*,
    534 U.S. 533 (2002) .....................................................................................35

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) .........................................................................15

*Rogin v. Bensalem Twp.*,
    616 F.2d 680 (3d Cir. 1980) .........................................................................25

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413 (1923) ...................................................................................... 17

*Schall v. Joyce*,
    885 F.2d 101 (3d Cir. 1989) ........................................................................ 20

*Schmidt v. Creedon*,
    639 F.3d 587 (3d Cir. 2011) ........................................................................ 25

*SH3 Health Consulting, LLC v. St. Louis Cty. Exec.*,
    20-605, 2020 WL 2308444 (E.D. Mo. May 8, 2020) ................................ 23, 28

*S. Bay United Pentecostal Church v. Newsom*,
    19A1044, 2020 WL 2813056 (U.S. May 29, 2020) .............................. 22, 29, 33

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ................................................................................ 18, 19, 21

*State Dep't of Envtl. Prot. v. Mazza & Sons, Inc.*,
    966 A.2d 82 (N.J. Sup. Ct. App. Div. 2009) .............................................. 13

*State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*,
    399 Fed. App'x 752 (3d Cir. 2010) .............................................................. 30

*State v. Fortin*,
    969 A.2d 1133 (N.J. 2009) .......................................................................... 20

*State v. Fortin*,
    642 A.2d 349 (N.J. 1993) ............................................................................ 20

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002) ................................................................................ 32, 34

*Tolle v. Northam*,
    20-363, 2020 WL 1955281 (E.D. Va. Apr. 8, 2020) ................................ 38, 39

*Trainor v. Hernandez*,
    431 U.S. 434 (1977) ...................................................................................... 19

*Truck Ctr., Inc. v. Gen'l Motors Corp.*,
    847 F.2d 100 (3d Cir. 1998) ........................................................................ 15

*UA Theatre Circuit v. Twp. of Warrington*,
    316 F. 3d 392 (3d Cir. 2003) ...................................................................24

*United States v. Fla. E. C. R. Co.*,
    410 U.S. 224 (1973) ...............................................................................26

*W.K. by W.K. v. N.J. Div. of Developmental Disabilities*,
    974 F. Supp. 791 (D.N.J. 1997) .....................................................................21

*Worthington v. Fauver*,
    440 A.2d 1128 (N.J. 1982) .............................................................................10

*Wrench Transp. Sys. v. Bradley*,
    340 F. App'x. 812 (3d. Cir. 2009) ...............................................................23

*Younger v. Harris*,
    401 U.S. 37 (1971) ..............................................................................*passim*

## Statutes

28 U.S.C. § 1367 ...........................................................................................35

42 U.S.C. § 5121-5207 ...................................................................................3

50 U.S.C. § 1601-1651 ...................................................................................3

N.J. Stat. Ann. App. §§ A:9-33 to -63 .........................................................5

N.J. Stat. Ann. App. § A:9-49 .....................................................................17

N.J. Stat. Ann. §§ 26:13-1 to -31 ..................................................................5

N.J. Stat. Ann. § 26:13-8(a) .................................................................11, 20

## Other Authorities

NJOEM Admin. Order 2020-02 ......................................................................6

N.J. Exec. Order 103 ......................................................................................5

N.J. Exec. Order 104 ......................................................................................5

N.J. Exec. Order 107 ...................................................................................6, 7

N.J. Exec. Order 148 ...................................................................................7, 8

N.J. Exec. Order 152 ...................................................................................8

N.J. Exec. Order 153 .............................................................................8, 9, 29

N.J. Exec. Order 154 ...................................................................................9

N.J. Ct. R. 2:2-3(a)(2) ...............................................................................12

N.J. Ct. R. 4:67-6 ..............................................................................12, 19

## PRELIMINARY STATEMENT

This is a case about a business's refusal to comply with the emergency orders that protect New Jersey residents from the spread of COVID-19, and that business's ongoing refusal to follow the proper procedures when challenging these orders. Over the past three months, New Jersey has embarked on a series of unprecedented actions to limit person-to-person contact, to stop the spread of a communicable and deadly disease that has claimed the lives of over 115,000 Americans, including over 12,000 state residents. Those measures have included the closure of various businesses that represent vectors for the disease, including all indoor recreational and entertainment businesses, such as indoor gyms and fitness centers. To their credit, the vast majority of businesses have remained in full compliance, notwithstanding the economic costs they have borne. That has helped New Jersey slow the spread of COVID-19, and to reduce both the rate of infection and the number of hospitalizations.

Unfortunately, the co-owners of Plaintiff Atilis Gym Bellmawr LLC chose a different path. To be clear, Plaintiff's owners did not file a lawsuit challenging New Jersey's emergency orders, which they would have had every right to do. Instead, they decided to simply violate the law by reopening their gym to the public on May 18, May 19, and May 20, 2020. They continued to do so even after law enforcement issued the owners summonses—criminal charges for disorderly persons offenses— on each of those days. As a result, Commissioner of the New Jersey Department of

1

Health Judith Persichilli took action, issuing an emergency closure order requiring Plaintiff to stay closed. But still Plaintiff's owners did not comply. And again, rather than challenge this order in court—as they could do—they simply violated it. So the State finally filed an enforcement action in Superior Court, demanding these owners stop violating New Jersey law, and seeking an order that Plaintiff's indoor premises be closed to the public. Judge Robert Lougy granted the State the requested relief, and the indoor premises of Atilis Gym were closed to the public once more.

But the problems did not end there. Because Plaintiff and its owners chose not to file actions challenging the Governor's emergency orders or the Commissioner's closure order, the State had been forced to initiate court actions—a criminal action initiated when law enforcement issued four summonses to Plaintiff's co-owners, and a civil enforcement action initiated when Atilis Gym stayed open notwithstanding the Department of Health's order. Those state courts present available and adequate forums in which to raise Plaintiff's challenges to New Jersey law. Instead of raising defenses in those proceedings, however, Plaintiff rushed to federal court, seeking an injunction that would directly interfere with—and, in fact, control—the disposition of those ongoing criminal and civil enforcement proceedings. This Court's respect for state courts means that it should rebuff Plaintiff's efforts; under the doctrine of *Younger* abstention, the parties' legal disputes must be resolved in those cases, not

here. For this reason, and also because Plaintiff's claims have no reasonable chance of success, this Court should deny the Motion for a Temporary Restraining Order.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY[1]

### A.    COVID-19's Spread and Devastating Impact on New Jersey.

Coronavirus disease 2019 ("COVID-19") is a contagious, and at times fatal, respiratory disease caused by the "severe acute respiratory syndrome coronavirus 2" virus, or "SARS-CoV-2." Its discovery at the end of 2019 in China, and its eventual spread to the United States, are well-documented. *See* Exs. A-C. Symptoms of the COVID-19 illness include fever, cough, and shortness of breath, which may appear in as few as two or as long as 14 days after exposure. *See* Ex. D.

As state and federal officials have recognized, COVID-19 represents a public health emergency unprecedented in modern times. On January 31, 2020, the United States Secretary of Health and Human Services declared a public health emergency in light of COVID-19. On March 13, 2020 and on March 18, 2020, President Trump also declared a national emergency pursuant to a variety of federal laws, including Sections 201 and 301 of the National Emergencies Act, 50 U.S.C. § 1601-1651, and Sections 401 and 501 of the Stafford Act on March 13, 42 U.S.C. § 5121-5207. These declarations all remain in effect today. *See* Exs. E-F.

---

[1] Combined for the court's convenience.

As officials have highlighted, COVID-19 is especially pernicious given the ease with which it spreads. The Centers for Disease Control and Prevention ("CDC") has stated that "[t]he virus that causes COVID-19 is thought to spread mainly from person to person, mainly through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs." Ex. D. And it can spread even though the COVID-19 carrier may be entirely asymptomatic or have only mild, cold-like symptoms. *See* Exs. G-H. In certain states—including in New Jersey, one of the global epicenters of the disease—COVID-19 has spread "easily and sustainably in the community … in many affected geographic areas. Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected." Ex. D.

As of the filing of this brief, worldwide 8,015,053 confirmed COVID-19 cases have been reported, and at least 436,322 lives have been lost. *See* Ex. I. The United States is at the center of the pandemic, with more confirmed cases (2,085,769) and deaths (115,644) than in any other nation. *See* Ex. J. And the impact of the virus in New Jersey has been especially acute. The impact was so immediately profound that, on March 25, 2020, the Federal Government declared New Jersey a "major disaster area." Ex. F. As of the filing of this brief, there have been 167,103 confirmed cases (which reflects 8.0% of all cases nationwide and 2.1% of all cases worldwide) and

12,676 deaths (11.0% nationwide and 2.9% worldwide) in New Jersey alone. *See* Ex. K. Medical experts have estimated that, in the worst case scenario, millions of Americans would die if governments had done nothing to prevent the spread of COVID-19. *See* Ex. L. There is still no vaccine or cure for COVID-19.

**B.    New Jersey's Actions to Combat COVID-19 in New Jersey.**

Under the Disaster Control Act ("DCA"), N.J. Stat. Ann. App. §§ A:9-33 to -63, and the Emergency Health Powers Act ("EHPA"), N.J. Stat. Ann. §§ 26:13-1 to -31, the Governor of New Jersey has authority to declare a public health emergency and a state of emergency, and is delegated extensive powers to protect the State's residents from an unfolding or ongoing crisis. Governor Murphy—in consultation with Commissioner Persichilli—declared that such emergencies exist on March 9, 2020, *see* N.J. Exec. Order 103, and he adopted a series of measures to limit the spread of COVID-19 in New Jersey and thus to save lives.

Guided by the recommendations of public health officials and scientists, the Governor's measures focused primarily on limiting person-to-person contact—the only tool, in the absence of a vaccine, to mitigate the spread of COVID-19. First, on March 16, Governor Murphy ordered the closure to the public of all recreational facilities, amusement centers, shopping malls, bars and restaurants (except for take-out and delivery services), and—most pertinent here—gyms and fitness centers. *See* N.J. Exec. Order 104 ("EO 104"). Just three days later, the Office of Emergency

Management ("NJOEM")—which the Governor authorized to issue further limits in response to this emergency—added barbershops, hair salons, nail salons, spas, and tattoo parlors to the list of closed services. *See* NJOEM Admin. Order 2020-02.

Guided by developing information on COVID-19, and as the crisis continued to worsen across the State, on March 21, 2020 Governor Murphy issued Executive Order 107, which superseded EO 104 in full and established at least two relevant requirements. First, the Order required that "[a]ll New Jersey residents shall remain home or at their place of residence," unless they were leaving their home for any one of nine enumerated reasons. *See* N.J. Exec. Order 107 ("EO 107") ¶2. Second, EO 107 mandated that a variety of businesses close their premises to the general public. The Order stated "[t]he brick-and-mortar premises" of "retail businesses must close to the public as long as this Order remains in effect," but "essential" retail stores— including pharmacies, grocery stores, medical supply stores, convenience stores, hardware and home improvement stores, child supply stores, pet stores, and liquor stores[2]—could remain open to the public. *Id.* ¶6. The Order also required the closure of "recreational and entertainment businesses" to the public, *id.* ¶9, and it mandated

---

[2] Alcohol is one of the few legal substances for which withdrawal can lead to death or require hospitalization of the addicted, which would take resources and staff away from treating COVID-19 patients in the midst of a pandemic. *See* Ex. M.

that restaurants and bars be limited to providing take-out and delivery, *see id.* ¶8. The businesses that had to close their premises to the public included gyms.

Because these restrictions helped limit the community spread of COVID-19 in New Jersey and to reduce the rates of infection and hospitalizations, in May the Governor announced "New Jersey's Road Back Plan"—a Plan designed to reopen the State safely while preventing deaths and cases of the virus from surging. And he has taken multiple steps to achieve that goal, with a special focus on expanding the permissible activities that take place outdoors, rather than indoors. *See* Ex. R (CDC Guidance noting that "[i]ndoor spaces are more risky than outdoor spaces where it might be harder to keep people apart and there's less ventilation" and recommending that individuals "[c]hoose outdoor activities and places where it's easy to stay 6 feet apart, like parks and open-air facilities"); Ex. S (a "study of the more than 300 outbreak clusters of COVID-19 in China reveals that the majority of the outbreaks were fueled by indoor transmission of the disease, while outdoor transmission was scarce"); Ex. T (concluding that "[t]he virus is harder to transmit outdoors because the droplets that spread it are more easily disturbed or dispersed outside in the elements than in a closed, confined, indoor setting").

As relevant to this litigation, the Governor incrementally allowed additional outdoor activities to occur, including outdoor recreation and outdoor fitness classes. Among other things, May 22, 2020, the Governor issued Executive Order 148 ("EO

148") to allow for additional outdoor gatherings to take place in the State—ordering at that time that up to 25 persons could participate in an outdoor gathering (even as indoor gatherings were limited to 10 persons). EO 148 ¶1. The Governor made clear that the changes in Executive Order 148 would extend to outdoor fitness classes even as gyms themselves remained closed. *See* Ex. U. And he explained that the State was making this choice due to "repeated observations from public health experts"—some of which are laid out above—"that outdoor environments present reduced risks of COVID-19 transmission as compared to indoor environments." EO 148, pp. 3-4; *see also id.* (finding that "it is appropriate … that certain gatherings in open-air spaces outdoors can be allowed while still maintaining reasonable restrictions to help limit the spread and prevent future outbreaks of COVID-19"). The same distinction held in Executive Order 152 ("EO 152"), which allows outdoor gatherings to take place with up to 100 persons but limits indoor gatherings to 50 persons. EO 152 ¶¶1-2.

On June 9, 2020, the Governor issued Executive Order 153 ("EO 153"), which rescinded the general stay-at-home order imposed by EO 107, and which permitted "[a]ll recreational and entertainment businesses … to reopen their outdoor spaces to the public," with a few exceptions not relevant here. EO 153 ¶4. However, the same recreational and entertainment businesses had to keep their *indoor* spaces closed to the public—who could only "enter the indoor premises of the recreation business when entering or exiting the establishment in order to access the outdoor area, or to

8

use the restroom." *Id.* ¶4(a). As he did before, the Governor explained the differences between outdoor and indoor recreation on the grounds that "indoor environments continue to pose a higher risk of COVID-19 transmission at this time." *Id.* p.3. The Governor in EO 153 also explained why "[i]ndoor recreational areas" had to remain closed even as indoor retail settings could reopen more broadly, finding that indoor recreation still "entails a higher risk than indoor retail settings" given that "indoor recreation typically involves individuals congregating together in one location for a prolonged period of time, while in indoor retail settings, individuals [do not] remain in close proximity for extended periods." *Id.* p.4 & ¶¶8, 11.

Most recently, on June 13, the Governor issued Executive Order 154 ("EO 154"), which permits personal care service facilities (*e.g.*, cosmetology shops, barber shops, beauty salons, spas, and tanning salons) to reopen to the public as of June 22, 2020, subject to stringent standards issued by the New Jersey Department of Health and Division of Consumer Affairs. EO 154 at ¶1. But the Order again provided a number of reasons to explain why personal care service facilities could reopen their premises to the public even while recreational businesses and dining establishments could not do so: "unlike other indoor activities, personal care services 1) typically do not have an outdoor alternative, 2) can be conducted with limited and controlled interactions, as opposed to in an uncontrolled environment, and 3) can be conducted with both staff and clients wearing masks at nearly all times." *Id.* at 4.

## C.   Plaintiff's Violations of the EO and Subsequent Proceedings

Although the vast majority of gyms and fitness centers in New Jersey acted consistently with the State's emergency orders, including by scheduling their fitness classes outdoors, *see, e.g.*, Ex. N, Atilis Gym did not. On May 13, 2020, Ian Smith, one of Plaintiff's co-owners, announced that he planned to open the gym in defiance of State law. *See* Ex. O. But rather than first challenge the governing Executive Order in court, *see, e.g., Worthington v. Fauver*, 440 A.2d 1128, 1130 (N.J. 1982) (noting that such challenges may be brought in the Appellate Division of the state Superior Court),[3] the gym instead simply reopened its doors to the public on May 18, 2020, at which point Smith and Plaintiff's other co-owner, Frank Trumbetti, each received a criminal summons from the Bellmawr Police Department for violating EO 107. Ex. P. The next day, Atilis Gym reopened again. *Id.* More summonses were issued. *Id.* This happened for a third time on May 20, 2020. *Id.*

In light of the gym's continued non-compliance with New Jersey's emergency orders, the Department of Health took action. The state's Emergency Health Powers Act empowers the Commissioner of the Department of Health to close the premises of a particular facility if it presents a danger to public health, including if that facility

---

[3] This is not speculative: there are at least four actions now pending in New Jersey Superior Court, Appellate Division that challenge the Governor's emergency orders, including actions filed by other closed businesses. *See Bayshore Enters. v. Murphy*, A-3616-19; *Isenberg v. Murphy*, A- (docket pending); *Italian Kitchen v. State*, A- (docket pending); *N.J. Republican State Comm. v. Murphy*, A- (docket pending).

may be a vector for a communicable disease such as COVID-19. *See* N.J. Stat. Ann. 26:13-8(a) (authorizing the Commissioner of Health to close "any facility of which there is reasonable cause to believe that it may endanger the public health"). The Commissioner explained why that statute was satisfied here. Even beyond the risks presented by indoor recreation generally, "indoor gyms and fitness centers present particularly high-risk settings for the spread of COVID-19." Dkt. 8-8 at 2. That was true "in part because customers of these facilities engage in physical activities that increase the customers' respiratory activity, which in turn can increase the amount of respiratory droplets or aerosols in a confined setting"; in part because gyms "foster prolonged and close person-to-person contact, including but not limited to through the use of personal trainers and spotters"; and in part because gyms "necessitate the communal-use of equipment and other items, such as barbells, dumbbells, and treadmill and cross trainer grips, that may harbor the virus." *Id.* at 3. Commissioner Persichilli added that "one study shared by the CDC observed that 'because of the increased possibility of infection through droplets, vigorous exercise in closely confined spaces should be avoided.'" *Id.*; *see also* Ex. H.

Moreover, the Commissioner continued, "although Atilis Gym is purporting to take its own measures to address COVID-19 transmission," the Executive Orders closed gyms on a categorical basis given the fact that "it will not be administrable, enforceable, and/or otherwise sufficiently protective of public safety to simply allow

businesses owners to set their own divergent health measures, done without approval of the State and its health officials." Dkt. 8-8 at 2. As a result, and in light of Atilis Gym's ongoing actions, Commissioner Persichilli ordered its premises "closed" and ordered that "[n]o members of the public, including members of the gym, shall be permitted inside of the facility." *Id.* at 3-4.

While Plaintiffs could have challenged the Department's closure order in the Appellate Division of the New Jersey Superior Court, *see, e.g.*, *Infinity Broadcasting v. Meadowlands Comm'n*, 901 A.2d 312 (N.J. 2006); N.J. Ct. R. 2:2-3(a)(2); Dkt. 8-8 at 3 ("RIGHT TO APPEAL: This Emergency Closure Order constitutes a Final Agency Decision of the New Jersey Department of Health which may be appealed to the Superior Court, Appellate Division"), Plaintiffs once again decided to simply violate the order by reopening Atilis Gym to the public on May 22, 2020. Later that day, the State filed a complaint, an order to show cause, and a demand for temporary restraints to enforce its May 20 order. Dkt. 13-1. Following a hearing later that day at which Plaintiff was represented by counsel,[4] Judge Robert Lougy granted the State

---

[4] Plaintiff could not challenge the validity of the May 20 order at this proceeding, because under state law such challenges are exclusively within the jurisdiction of the Appellate Division. N.J. Ct. R. 2:2-3(a)(2). However, if Plaintiff had made such a challenge, whether before or after the enforcement action commenced, the Appellate Division could have entered a stay of the enforcement proceedings, transferred the appeal to the trial court, or taken other actions "respecting the order of proceedings as it deems appropriate." This system is designed to maintain order and comity in the state courts—Plaintiff "cannot simply disregard the final agency action, wait for the agency to bring an enforcement action under Rule 4:67-6 in a trial court, and

temporary restraints and authorized the State to secure Plaintiff's premises. Dkt. 13-2; *see also, e.g.*, Dkt. 1 at ¶12 (alleging that the State "chang[ed] the locks" but not disclosing that this action was taken pursuant to a court order). That same day, Judge Lougy also entered an order to show cause why preliminary restraints should not be granted, with a hearing scheduled for June 8, 2020. *See* Dkt. 13-2.

Plaintiff, however, did not proceed to litigate the dispute in state court. Rather, four days after Judge Lougy issued an order granting the State temporary restraints, Plaintiff filed a Complaint in this Court. *See* Dkt. 1. And on June 7—one day before the return date in the state enforcement proceeding, and ten days after Plaintiff filed the Complaint—Plaintiff moved before this court for a temporary restraining order. Dkt. 8. Plaintiff now seeks a temporary and preliminary injunction "(1) enjoining Defendants and their officers, employees, and agents from enforcing their Orders, and (2) requiring Defendants and their officers, employees, and agents in their official capacities to remove the locks to the Plaintiff Gym and allow Plaintiff to operate its business according to the safety measures and implementations described in this motion and Plaintiff's Certification." Dkt. 8-1 at 15. But Plaintiff did not make those same requests of the state court; instead, it failed to file anything at all by June 8, so Judge Lougy entered preliminary restraints by default. *See* Ex. Q.

---

then challenge the agency action in defense of the enforcement action." *State Dep't of Envtl. Prot. v. Mazza & Sons, Inc.*, 966 A.2d 82, 88 (N.J. Sup. Ct. App. Div. 2009).

After Plaintiff filed a Complaint and a TRO motion in this Court, Plaintiff and the State returned to the Superior Court. *See* Ex. V-W. Plaintiff still did not raise an overall challenge to Executive Order 107's treatment of gyms, nor did it challenge the heart of the Department of Health's May order; to the contrary, it sought relief from the state courts only to sell supplements and apparel from its indoor premises. Ex. V at 1; Ex. W at 2-3. The parties agreed that supplements and apparel could be sold from the indoor premises, so long as no indoor recreation took place, and sent a letter to Judge Lougy to that effect. *See* Ex. V. The joint proposed amended consent order clarified that Plaintiff may not "permit[] any interior recreation activity of any kind to occur" at the indoor premises, and that "[a]ny violation of this Order shall subject Defendant to summary contempt-of-court proceedings." *See* Ex. W at 3-4. (Plaintiff also agreed that it would forego filing a threatened emergent appeal to the Appellate Division.) Judge Lougy signed that order without modification. *Id.*

Nevertheless, Plaintiff has not withdrawn its action in this Court. As a result, Plaintiff is continuing to raise the following claims: procedural and substantive due process violations, Dkt. 1 at ¶¶ 23-33; equal protection violations, *id.* at ¶¶ 34-43; Takings Clause violations, *id.* at ¶¶ 44-53; and violations of the New Jersey State Constitution, *id.* at ¶¶15, 29. The State now responds.

## STANDARD FOR PRELIMINARY INJUNCTION

"[T]he grant of injunctive relief," courts have explained, "is an extraordinary remedy which should be granted only in limited circumstances." *Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1998); *see also, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (the "dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat"). "Such stays are rarely granted" in the Third Circuit because "the bar is set particularly high." *Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, 13-144, 2013 WL 1277419, *1 (3d Cir. Feb. 8, 2013). To grant preliminary injunctive relief, the court must first determine whether these factors are met:

> (1) A likelihood of success on the merits; (2) that [the plaintiff] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

The moving party always has the burden of "meet[ing] the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). And even if the moving party satisfies those first two tests, a court must still "consider[] the remaining two factors"—the balance of the equities and public interest—"and determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Kos Pharms*, 369 F.3d

15

at 708. Finally, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018) (citation omitted); *see also, e.g.*, *Conestoga Wood*, 2013 WL 1277419, *1 (noting that "an injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief").

## ARGUMENT

Plaintiffs' application for a preliminary injunction fails for two reasons: their lawsuit will ultimately not prevail on the merits, and the remaining equitable factors militate against granting the requested relief.

## I.   PLAINTIFF WILL NOT SUCCEED ON THE MERITS.

### A.   This Court Must Abstain From Hearing This Case.

Although federal courts typically hear and decide any case over which they have jurisdiction, the Supreme Court has for decades recognized a "far-from-novel" exception to that rule, known colloquially as *Younger* abstention, which "requires federal courts to abstain from deciding cases that would interfere with certain ongoing state proceedings." *Malhan v. Sec'y U.S. Dep't of State,* 938 F.3d 453, 462 (3d Cir. 2019). The purpose of this rule, announced in *Younger v. Harris*, 401 U.S. 37 (1971), is "[t]o promote comity between the national and state governments." *Malhan,* 938 F.3d at 462. Courts have consistently recognized three circumstances

16

in which *Younger* abstention applies: "(1) ongoing state criminal prosecutions; (2) [pending] certain civil enforcement proceedings; and (3) pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78-79 (2013)). This doctrine proves fatal to Plaintiff's motion.[5]

*Younger* applies because there are both ongoing state criminal prosecutions and qualifying civil enforcement proceedings. The former is straightforward. Under the New Jersey Civil Defense and Disaster Control Act—the State's law governing its emergency response—any person who "[v]iolate[s] any order, rule or regulation adopted by the Governor and promulgated as provided by this act … shall be adjudged a disorderly person and shall be subject to imprisonment for a term not to exceed 6 months or shall pay a fine not to exceed $1,000.00 or to both a fine and imprisonment, in the discretion of the court." N.J. Stat. Ann. App. A:9-49. Violations are "prosecut[ed] … in the municipal court of the municipality wherein the offense

---

[5] The *Younger* and *Rooker-Feldman* doctrines are closely related. *See generally D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). The latter bars federal court re-adjudication once the state court has finally decided any federal constitutional issues between the parties, and it acts as a jurisdictional bar altogether. *See Malhan*, 938 F.3d at 458-61. The former applies to *ongoing* state court proceedings—including where appeals may still lie—and it bars federal court interference in those proceedings. Because the state court proceedings are ongoing (Plaintiff's time to appeal Judge Lougy's decision has not yet expired), *Younger* governs this Court's consideration of the instant motion; had they reached final resolution, *Rooker-Feldman* would have governed instead.

17

is alleged to have occurred," and a prosecutor must "prove all elements of the offense beyond a reasonable doubt in order to obtain a conviction." *Id.* It is beyond dispute that Plaintiff's co-owners face ongoing state criminal charges and prosecution for their repeated violations of the Executive Orders at issue here, and this request for relief would allow them to engage in the conduct at issue in those proceedings. *See* Ex. P (summonses to Smith and Trumbetti). Said simply, enjoining the State from enforcing Executive Order 107 against Atilis Gym would directly "interfere with" ongoing state criminal prosecutions.

This Court must also abstain in light of the ongoing enforcement proceeding brought by the New Jersey Department of Health in Superior Court. Like a criminal enforcement proceeding, a state civil enforcement proceeding can call for abstention. *See, e.g., Sprint*, 571 U.S. at 79; *Gonzalez v. Waterfront Comm'n of N.Y. Harbor*, 755 F.3d 176, 181 (3d Cir. 2014) (same). To determine whether a particular kind of civil enforcement proceeding triggers *Younger*, federal courts ask whether "a state actor is routinely a party … and often initiates the action"; whether the suits "often begin with internal investigations that 'culminat[e] in the filing of a formal complaint or charges'"; and whether the actions "are characteristically initiated to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act." *Gonzalez*, 755 F.3d at 181 (quoting *Sprint*, 571 U.S. at 79). Based on this multifactor balancing test, the Court has abstained in a wide array of analogous cases, including

18

"state-initiated administrative proceedings" that attempt to "enforce state civil rights laws," to "gain custody of children allegedly abused by their parents," to "recover welfare payments defendants had allegedly obtained by fraud," and to "enforce obscenity laws." *Sprint*, 571 U.S. at 80-81 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986); *Moore v. Sims*, 442 U.S. 415, 419-20 (1979); *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 598 (1975)). The Third Circuit even applied *Younger* abstention to disciplinary proceedings by a waterfront commission against one of its employees. *See Gonzalez*, 755 F.3d at 185.

The Department of Health's civil enforcement lawsuit against Plaintiff shares these characteristics. The May 20 closure order was initiated by the Commissioner of Health in her official capacity, pursuant to authority under the Emergency Health Powers Act, which empowers her "[t]o close, direct and compel the evacuation of … any facility of which there is reasonable cause to believe that it may endanger the public health." *See* Dkt. 1-4 at 3. Because the Commissioner alone has the power to issue such an order under the EHPA, a state actor will always—not just "often"—be the one to seek its enforcement. (Indeed, the Commissioner relied on New Jersey Court Rule 4:67-6 for the underlying action—which is limited to state enforcement of final agency decisions.) Orders like these also follow an investigation—the EHPA requires the Commissioner to have "reasonable cause" to believe there is a threat to

19

public health, *see* N.J. Stat. Ann. 26:13-8(a), and her order here describes the factual findings on which she had relied, *see* Dkt. 8-8 at 2 (recounting, *inter alia*, Plaintiff's refusal to comply with Governor Murphy's Executive Orders, and detailing why its proposed actions would put the public health at risk). And of course, court-ordered restraints to close and secure the premises are a sanction for creating a public health hazard in the State. *See* Dkt. 13-2; Ex. Q.

Because there are ongoing state criminal and civil enforcement proceedings, this Court must abstain so long as those state proceedings (1) "are judicial in nature"; (2) "implicate important state interests"; and (3) "afford an adequate opportunity to raise federal claims." *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989) (citing, e.g., *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). These proceedings each satisfy those criteria. There is no dispute that these civil and criminal proceedings are judicial in nature, nor can there be doubt that they implicate important state interests regarding public health, public safety, and compliance with emergency orders. Similarly, these proceedings supply an adequate opportunity in which to raise federal claims. With respect to the criminal proceedings, defendants in New Jersey state court are free to allege that the prosecutions violate the federal constitution, and to prevail on that basis. *See, e.g.*, *State v. Fortin*, 969 A.2d 1133 (N.J. 2009) (Ex Post Facto Clause); *State v. Vawter*, 642 A.2d 349 (N.J. 1993) (First Amendment). The same is true with respect to the ongoing civil proceedings. While

Plaintiff could not raise his federal constitutional arguments before Judge Lougy in the state enforcement action itself, Plaintiff can still file its challenge to Executive Order 107 and to the closure order in the Appellate Division. *See, e.g., W.K. by W.K. v. N.J. Div. of Developmental Disabilities*, 974 F. Supp. 791, 795-96 (D.N.J. 1997) (noting, in a civil enforcement context, that "[t]he Appellate Division is authorized to exercise full judicial review of all final decisions of New Jersey state agencies" and that analogous plaintiffs therefore "clearly have an adequate opportunity to raise their constitutional challenges in the state proceedings"); *see also supra* pp. 10-14. Because the *Younger* doctrine applies to this suit, a federal court "must" abstain from hearing it. *Sprint*, 571 U.S. at 72.[6]

Plaintiff could have challenged the Executive Orders and the Commissioner's May 20 order in state court, and still can. Notwithstanding the ongoing proceedings,

---

[6] None of the potential exceptions apply. *See W.K.*, 974 F. Supp. at 796 (noting that exceptions exist when "(1) the 'state proceeding is motivated by a desire to harass or is conducted in bad faith,' (2) the 'challenged provision is flagrantly and patently violative of express constitutional prohibitions,' or (3) there is 'an extraordinarily pressing need for immediate equitable relief.'") (citations omitted). There are no plausible allegations of bad faith harassment here, as the record reflects state efforts to ensure compliance by indoor recreation facilities generally. Further, in any event, "the bad faith prosecution exception is not available where the pending claims could be presented in state proceedings and there is no allegation of impermissible bias on the part of the state judiciary." *Id.* There is also no flagrant legal violation because EO 107 is not "flagrantly and patently violative of express constitutional provisions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Id.* And there is no extraordinarily pressing need for relief here, a limited criterion that can only be met when "there is no available state forum for the plaintiff's constitutional claims." *Id.*

Plaintiff came to federal court instead. Out of respect for the adequate and available New Jersey state courts, this Court must abstain.

**B.   Plaintiff's Claims Fail on the Merits**.

Although *Younger* abstention is reason enough to conclude that Plaintiff has no likelihood of success, Plaintiff's claims also fail as a matter of constitutional law. That is true under each of the provisions on which it relies—the Due Process Clause, the Equal Protection Clause, the Takings Clause, and the New Jersey Constitution.[7]

*i.   Due Process Clause (Count I)*

Plaintiff argues that the State's actions violated its substantive and procedural due process rights, but it is incorrect on both scores.

---

[7] Before turning to the claims themselves, the State begins with the governing legal standard. In light of the State's sweeping authority to respond to emergencies, *see Jacobson v. Massachusetts*, 197 U.S. 11, 24-25 (1905); *S. Bay United Pentecostal Church v. Newsom*, 19A1044, 2020 WL 2813056, *1 (U.S. May 29, 2020) (Roberts, C.J., concurring), courts must grant the State's elected leaders additional leeway as they craft solutions for an unfolding or ongoing crisis in the face of uncertain and developing information. As a result, *Jacobson* explained, during an emergency the traditional tiers of constitutional scrutiny do not apply, and courts will "only" strike down a law when it "[1] has no real or substantial relation to those objects, or [2] is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." 197 U.S. at 31. Said another way, courts intervene only if a state's emergency actions are so "arbitrary" that they "justify the interference of the courts to prevent wrong and oppression." *Id.* at 28, 38. The logic is simple: "a community has the right to protect itself against an epidemic or disease," *id.* at 27, and "[t]he mode or manner in which those results are to be accomplished is within the discretion of the state," *id.* at 25. Because Plaintiff's claims all fail on the merits, it follows that there is no "plain, palpable invasion" of the relevant constitutional provisions.

As courts facing analogous challenges have found, "[t]o establish a violation of substantive due process, a plaintiff has to show that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *SH3 Health Consulting, LLC v. St. Louis Cty. Exec.*, 20-605, 2020 WL 2308444, *9 (E.D. Mo. May 8, 2020) (emphasis in original); *see also Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (same). In this case, Plaintiff has neither identified any right triggering heightened protection under substantive due process nor highlighted any actions that shock the conscience.

Plaintiff appears to rely on two rights that it asserts are implicit in the concept of ordered liberty—the right to travel, and the right to engage in its business. But the former is in no way impacted by closure of the gym's interior space, and the Third Circuit has rejected application of substantive due process to the latter. *See Wrench Transp. Sys. v. Bradley*, 340 F. App'x 812, 815 (3d. Cir. 2009) (holding that a "right to 'engage in business'" is "not protected by substantive due process"); *Joey's Auto Repair & Body Shop v. Fayette Cty.*, 785 F. App'x 46, 50 (3d Cir. 2019) (same); *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 n.12 (3d Cir. 2006) (public employment); *Nicholas*, 227 F.3d at 141 (noting "substantive due process review" applied "to cases involving real property ownership" in contrast to cases involving a loss of business associated with the property). Other courts have reached the same conclusion. *See,*

23

*e.g.*, *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 n.4 (11th Cir. 2009) (finding that "employment rights do not enjoy substantive due process protection"); *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) (same).

The State of course recognizes the importance, centrality, and dignity of work—which is why it has never and would never require such business closures outside of this unprecedented emergency. The only issue here, however, is whether that claim supports Plaintiff's substantive due process argument, and Third Circuit case law says it does not. Indeed, on that basis alone, a federal court recently rejected a similar claim by a gym challenging another state's analogous restriction. *See Best Supplement Guide, LLC v. Newsom*, 20-965, 2020 WL 2615022, *6 (E.D. Cal. May 22, 2020) (rejecting due process claim on the basis that the Supreme Court had never found the doctrine to apply to this right). The same result is proper here.

The State's actions also do not shock the conscience, a standard encompassing "the most egregious official conduct." *UA Theatre Circuit v. Twp. of Warrington*, 316 F. 3d 392, 400 (3d Cir. 2003). As explained above, because COVID-19 spreads among asymptomatic carriers, and because there remains no cure and no vaccine, the only tool the States have to limit the spread of this communicable and sometimes-fatal disease is to place limits on person-to-person contact, especially in higher-risk environments. Indoor gyms in particular present a high risk of COVID-19 spread in light of the increase in customers' respiratory activity while working out, prolonged

and close person-to-person contact, and the use of common equipment. *See* Dkt. 8-8 at 3. It thus in no way shocks the conscience that New Jersey—like so many other states—would adopt measures to prevent person-to-person interaction from taking place in indoor gyms, and instead require physical activity to take place outdoors, where the transmission risks are lower. *See supra* at 6-12.

Plaintiff's procedural due process claim gets it no further. Its claim is "subject to a 'two-stage' inquiry: (1) whether the plaintiff has a 'property interest protected by procedural due process,' and (2) 'what procedures constitute due process of law.'" *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011) (quoting *Gikas v. Wash. Sch. Dist.*, 328 F.3d 731, 737 (3d Cir. 2003)). This Court need not evaluate whether the first prong is satisfied because the second part of the analysis—which asks what procedures are necessary, and whether they were in place—is dispositive.

The first flaw in Plaintiff's argument is that these Executive Orders are rules of general applicability. As courts have held for over a century, such laws are not subject to the same due process dictates as individualized orders, which is the reason Congress can adopt laws without granting every affected person a hearing before it does so. *See Rogin v. Bensalem Twp.*, 616 F.2d 680, 693 (3d Cir. 1980) (noting that a rule calling on every person affected by a general law to receive "procedural due process [rights] including hearings, opportunity for confrontation and response, clear standards, an impartial arbiter, and possibly judicial review would be inconsistent

with the structure of our system of government"); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (law of general applicability does not violate procedural due process because "legislative determination provides all the process that is due"); *United States v. Fla. E. C. R. Co.*, 410 U.S. 224, 245-46 (1973) (noting no due process right triggered by agency action applicable "across the board to all common carriers" if "no effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances"); *Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule….").

Courts have properly held that this distinction disposes of analogous claims. In *Hartman v. Acton*, 20-1952, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020), one bridal shop owner claimed that Ohio's business closures—also adopted in response to COVID-19—violated his due process rights. *Id.* at *1. The court responded that a "hearing is not required at all … where the State has issued a generally applicable law or order." *Id.* at *7. The court explained why this result was still fair: "the law's generality 'provides a safeguard that is a substitute for procedural protections.'" *Id.* at *8 (quoting *Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir.

26

2004)). "The fact that an agency's order 'may in its effects have been thought more disadvantageous by some ... than by others does not change its generalized nature.'" *Id.* (quoting *Fla. E. C. R. Co.*, 410 U.S. at 246). A gym that challenged California's closure orders fared no better; the court similarly rejected a procedural due process claim because the law does not "require[] this type of pre-deprivation process before enacting and enforcing laws of general applicability." *Best Supplement Guide*, 2020 WL 2615022, *5. So too here. Because EO 107 was not "targeted at individual gym owners or particular facilities" and instead "prohibit[s] the operation of all gyms and workout facilities" in the State, the procedural due process claim fails. *Id.*[8]

There is a second, independently sufficient flaw Plaintiffs will not overcome: "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). Plaintiff plainly could have appealed EO 107 to the Appellate Division, including to raise its federal constitutional arguments. The same is true of the Commissioner's closure order. *See* Dkt. 8-8 at 3 ("RIGHT TO APPEAL: This Emergency Closure Order constitutes a Final Agency Decision of the New Jersey Department of Health

---

[8] While Commissioner Persichilli's May 20 closure order was specific to this facility, it was derivative of the EO's closure of all gyms and indoor fitness centers, including but not limited to Plaintiff's. The individual order was called for because Plaintiff's owners were simply refusing to comply with EO 107.

which may be appealed to the Superior Court, Appellate Division"). Plaintiff has failed to avail itself of these options, even now. *See, e.g., SH3 Health Consulting*, 2020 WL 2308444, *9 (finding that analogous post-deprivation remedies constitute sufficient due process in the context of the COVID-19 pandemic). For this reason, too, the procedural due process claim has little chance of success on the merits.

### ii.   *Equal Protection Clause (Count II)*

Plaintiff's Equal Protection claims also lack merit. Because Plaintiff has not shown that Executive Order 107 violates its fundamental rights, and because EO 107 does not discriminate on the basis of any suspect classification, the Order is subject only to rational basis review. *See L.A. v. Hoffman*, 144 F. Supp. 3d 649, 675 (D.N.J. 2015) (finding rational basis review applies in "areas of social and economic policy" that do not distinguish based upon suspect lines); *Best Supplement Guide*, 2020 WL 2615022, *6 (applying rational basis review to a gym's analogous equal protection challenge). As the Third Circuit has held:

> Rational basis review is a very deferential standard. It is met "if there is any reasonably conceivable state of facts that could provide a rational basis" for the differing treatment. We have held that "the principles of equal protection are satisfied 'so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'" The Supreme Court has emphasized that "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."

*Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (citations omitted). That standard presents a challenge Plaintiff cannot overcome.

The State plainly had a rational reason to treat gyms and indoor fitness centers differently than it treats (1) outdoor activities, (2) indoor retail, and (3) personal care services—the primary businesses that the State has authorized to reopen to the public as part of the second phase of its Road Back Plan. For one, the record provides more than enough support for a rational public official to conclude that the State can allow outdoor activities to proceed, such as recreation and dining, even as indoor recreation stays closed. *See* EO 148, pp.3-4 (noting "outdoor environments present reduced risks of COVID-19 transmission as compared to indoor environments"); Exs. H, R-U (substantiating the State's findings that open-air outdoor environments present reduced transmission risks); *supra* at pp.6-12.

It was also rational to conclude that indoor recreation presents a greater threat than retail, given that "indoor recreation typically involves individuals congregating together in one location for a prolonged period of time, while in indoor retail settings, individuals [do not] remain in close proximity for extended periods." EO 153 pp.4 & ¶¶8, 11; *see S. Bay United Pentecostal Church*, 2020 WL 2813056, *1 (Roberts, C.J., concurring) (making the same observation). And it was rational to find that, on a categorical basis, the benefits of personal care services were greater, and the costs of COVID-19 transmission were lower, than for indoor recreation. *See* EO 154 at 4

29

(noting that "personal care services 1) typically do not have an outdoor alternative, 2) can be conducted with limited and controlled interactions, as opposed to in an uncontrolled environment, and 3) can be conducted with both staff and clients wearing masks at nearly all times"). Given that New Jerseyans are free to work out at home, or walk, jog, or attend fitness classes outside—activities that are safer than gym use—it is no surprise the State distinguished between the two contexts in this way. At bottom, the State's rules reflect good-faith efforts by its elected leaders to expand economic activity while limiting the spread of COVID-19, and do not evince justifications "so attenuated as to render the distinction arbitrary or irrational."

To be clear, the point is not that every single interaction in an indoor recreation environment poses a greater risk of COVID-19 transmission than every interaction in an outdoor environment, a retail environment, or in a personal care service facility. The point is only that the State could rationally conclude that, on a categorical basis, indoor recreation presents greater risks of person-to-person contact and COVID-19 spread. After all, on rational basis review, "perfection is by no means required," and the State's leaders must receive significant deference to enforce a classification even where it "is to some extent both underinclusive and overinclusive." *State Troopers Non-Commissioned Officers Ass'n of New Jersey v. New Jersey*, 399 Fed. App'x 752, 755 (3d Cir. 2010). That is especially true here, as indoor gyms are an especially risky form of indoor recreation. *See* Dkt. 8-8 at 3 (finding that gyms present a public

30

health threat given the increase in customers' respiratory activity while working out, prolonged and close person-to-person contact, and use of common equipment).

Another district court that recently considered an analogous question thus had little trouble rejecting Plaintiff's equal protection claims. In *Best Supplement Guide*, the court specifically rejected the argument that "it is arbitrary to keep gyms closed when they are equally as capable of complying with the CDC's social distancing guidelines as businesses that have been allowed to reopen." 2020 WL 2615022, *6. To the contrary, relying on analogous record evidence, the Court held that there were "several reasons why the challenges posed by reopening gyms differ, both in kind and in scale, from those that arise when reopening other businesses," and that their closures remains justified. *Id.* This Court should hold the same here.

### iii.   Takings Clause (Count III)

Plaintiff's final federal constitutional claim fares no better. Plaintiff's claim fails to two independent reasons—the Takings Clause has not been violated, and the Takings Clause supplies no basis for the relief Plaintiff seeks.

The Takings Clause was not violated. The law is clear: "A compensable taking does not occur when the state prohibits the use of property as an exercise of its police powers rather than for public use." *Ass'n of N.J. Rifle & Pistol Clubs v. AG of N.J.*, 910 F.3d 106, 124 n.32 (3d Cir. 2018). To the contrary, a State may require closure of dangerous facilities, or protect the public from dangerous items, without having

to provide compensation. *See, e.g., Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 335 (2002) (noting "orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings ... have long been considered permissible exercises of the police powers" that do not entitle individuals affected to compensation); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1032 (1992) (holding that "harmful or noxious uses of property may be proscribed by government regulation without the requirement of compensation"); *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887) (finding that a "prohibition simply upon the use of property for purposes that are declared ... to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for public benefit"); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) (confirming that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause"); *Chi., B. & Q. R. Co. v. Ill.*, 200 U.S. 561, 594 (1906) (adding "the legislature may make police regulations, although they may interfere with the full enjoyment of private property and though no compensation is given."). That is as it should be, or else law enforcement could never lock down a crime scene or ban individuals from possessing dangerous items like chemicals, bombs, drugs, or wild animals without paying the owners. That is not, and has never been, the law.

*National Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57 (3d Cir. 2013), is illustrative. In that case, a municipality "ordered closed for five months an open-air flea market … due to safety concerns." *Id.* at 60. (The safety concerns came from "unexploded munitions left behind when the site had been used as a weapons-testing facility for the United States Army." *Id.*) There, as here, the owner "filed a motion for a preliminary injunction requesting that the emergency closure order be lifted," and argued that property had been taken without just compensation. *Id.* Relying on the Supreme Court's conclusion that "'orders temporarily prohibiting access to … businesses that violate health codes' … do not entitle the individuals affected to compensation, *id.* at 63 (quoting *Tahoe-Sierra Pres. Council*, 535 U.S. at 335), the Third Circuit held that it was "difficult to imagine an act closer to the heartland of a state's traditional police power than abating the danger posed" at that market, *id.* As a result, a town's "emergency action to temporarily close" the facility reflected "an exercise of its police power that did not require just compensation." *Id.*

Because it is also difficult to imagine an act closer to the heartland of a state's traditional police power than seeking to abate the spread of a communicable disease in the midst of a public health pandemic, *see generally S. Bay United Pentecostal Church*, 2020 WL 2813056, *1 (Roberts, C.J., concurring) (noting the Constitution "principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect'"), the decision to limit the

spread of a disease by closing gyms to the public is also an exercise of New Jersey's police power that does not require just compensation.[9]

Even if this court disagrees, the Takings Clause claim supplies no basis for the injunction Plaintiff seeks—let alone the preliminary injunction it demands. As the Supreme Court has explained, the Fifth Amendment does *not* bar the government from taking property; rather, it contemplates that the government can and will do so, and simply requires that the government later provide adequate compensation. *See First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 315 (1987) (noting the Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of … a taking"). It follows that, "in general, 'equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to a taking.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127–

---

[9] Seeking to overcome these obstacles, Plaintiff characterizes the gym's closure, Dkt. 1 at ¶46, and the locking of the gym pursuant to the state court's orders, id. ¶47, as a "physical taking." Physical takings, however, involve the government exercising "possession of an interest in property for some public purpose," *Tahoe-Sierra Pres. Council*, 535 U.S. at 332, that "destroys ... a property owner's right to exclude" others from using the property, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Plaintiff does not allege that the State provided anyone with access to the gym facility for some public use over its objection. To the contrary, the State's order simply codified what the Governor's general Executive Orders already required Plaintiff to do. By Plaintiff's logic, every closure—from the health code violation to the crime scene—would be an impermissible physical taking.

28 (1985) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984)). That is especially true for preliminary relief. *See Hynoski v. Colum. Cty. Redevelopment Auth.*, 485 F. App'x 559, 563 (3d Cir. 2012) ("[T]he taking of real property can be adequately remedied by monetary compensation and that the intangible personal connection to property does not render condemnation an irreparable injury."). So not only does the claim fall short, but it cannot support Plaintiff's requested relief.

iv.    *New Jersey Constitution*

Finally, to the extent Plaintiff asserts state law violations, *see* Dkt. 1 ¶¶15, 29 & Requested Relief (1) (claiming violations under state constitution), those claims cannot succeed in light of the State's sovereign immunity. *See, e.g., King v. Christie*, 981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013) ("Under the Eleventh Amendment, … Plaintiffs may not bring state law claims—including state constitutional claims— against the State regardless the type of relief it seeks."). And although 28 U.S.C. § 1367 affords supplemental jurisdiction over pendant state law claims, that "does not authorize district courts to exercise jurisdiction over claims against nonconsenting states." *King*, 981 F. Supp. 2d at 310 n.12; *see also Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 540-41 (2002) (holding "the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants"). Here, the State has not consented to this lawsuit filed in federal court, so any asserted state law claims will ultimately be dismissed.

## II.   THE REMAINING FACTORS MILITATE AGAINST GRANTING PRELIMINARY OR TEMPORARY INJUNCTIVE RELIEF.

Even beyond the fact that this Court should abstain from hearing this case and that Plaintiff's claims will not prevail on the merits, Plaintiff also cannot demonstrate that the remaining factors cut in its favor.

Notably, Plaintiff cannot make a showing of irreparable harm here. For one, even assuming a right to relief, the ultimate remedy would be aimed at the business losses it has sustained. *See* Dkt. 8-2 at ¶ 34 (claiming monetary damages in loss of income to pay monthly rent); *Benner v. Wolf*, 20-775, 2020 WL 2564920,*8 (M.D. Pa. May 21, 2020) (assessing similar claims by businesses challenging other state orders and seeking temporary relief). Because the purpose of a temporary restraining order is to protect a plaintiff from harm that cannot be addressed by legal or equitable remedy at the conclusion of the case, "economic harms are generally insufficient to show irreparable harm in the context of such extraordinary emergency relief." *Id.* (citing *Ecri v. McGraw-Hill, Inc.*, 890 F.2d 223, 226 (3d Cir. 1987)). In short, this Court can recognize that an economic loss can be "significant" and "sympathetic," but still not a basis for relief at this early stage because the losses remain "exclusively financial and largely hypothetical." *Id.* at *9. That is especially so given "the low likelihood of success on the merits of [Plaintiff's] claims." *Id.*[10]

---

[10] Plaintiff is also the beneficiary of at least two fundraisers seeking donations for support during the closure. The first, opened on April 13, 2020 by "Ian Smith … on

36

Three other facts undermine Plaintiff's asserted need for immediate temporary relief. For one, Plaintiff waited 16 days after the Commissioner of Health issued her closure order to file this request for a temporary restraining order—and nearly three months after the measures announced in EO 107. *See Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*, 19-8828, 2019 WL 1519026, *4 (D.N.J. 2019) (noting that "delay in filing" for such relief "undermines" claims for irreparable harm); *Pharmacia Corp. v. Alcon Labs.,* 201 F. Supp. 2d 335, 382 (D.N.J. 2002) (a delay can "knock[] the bottom out of any claim of immediate and irreparable harm," and is a "dispositive basis" for rejecting a preliminary injunction). For another, relatedly, during that entire time period Plaintiff never challenged EO 107 in state court either, a forum that is available to hear and adjudicate these same claims. That failure is all the more striking given that the State brought an enforcement action during that time and obtained a ruling from Judge Lougy ordering Plaintiff to come into compliance.

---

behalf of Frank Trumbetti" (*i.e.*, Plaintiff's two co-owners), has resulted in donations totaling $17,535. *See* "Atilis Gym Bellmawr COVID-19 Relief," Gofundme.com, *available at* https://www.gofundme.com/f/atilis-gym-bellmawr-covid19-relief (last visited June 16, 2020). A second fund "to pay the bills for the months we have been closed due to the COVID pandemic," opened on May 18, 2020 by "Atilis Bellmawr Members … on behalf of Frank Trumbetti," has to date generated donations of $85,504. *See* "Atilis Bellmawr Court Relief," Gofundme.com, *available at* https://www.gofundme.com/f/mk6ez-atilis-bellmawr-court-relief (last visited June 16, 2020). This combined income of more than $100,000 contrasts with Plaintiff's alleged losses of approximately $40,000, which includes three months' rent as well as $15,000 in voluntary renovation expenditures that Plaintiff allegedly incurred to "responsibly open the gym." Dkt. 8-2 at ¶¶ 14, 34.

And finally, the State and Plaintiff agreed on an amended consent order allowing for retail sales of supplements and apparel at this location, while also establishing that Atilis Gym cannot "permit[] any interior recreation activity of any kind to occur" at its indoor premises, and "[a]ny violation of this Order shall subject Defendant to summary contempt-of-court proceedings." *See* Ex. W at 3-4.

On the other side of the ledger, the State would face considerable harm from the grant of an injunction in this case—indicating that both the balance of equities and the public interest militate against preliminary relief. As a general matter, a State suffers irreparable harm anytime it is enjoined by the court from enforcing one of its policies. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). But the harm from upending the current closures of gyms and other indoor recreation would be especially profound in the State. *See, e.g., Benner*, 2020 WL 2564920, *9 ("The Orders were instituted for the express purpose of protecting the public, and while we acknowledge that Petitioners have important financial equities at play in this case, they have failed to adduce evidence to prove that their losses outweigh the grave harms that could result to all [State residents] from a widespread COVID-19 outbreak."); *Tolle v. Northam*, 20-363, 2020 WL 1955281, *1 (E.D. Va. Apr. 8, 2020) ("[I]t is no exaggeration to recognize that the stakes for residents of the [State] are life-or-death."). The State has repeatedly found that indoor recreation presents a serious risk of COVID-19 transmission, and the Commissioner of Health noted this

is true of indoor gyms in particular. And that heightened risk of contracting COVID-19 would extend not just to those people who accept that risk and choose to frequent Plaintiff's gym, but also to anyone who they later interact with, and then for those who *they* contact, and the next people, and the next. *See Tolle*, 2020 WL 1955281, *1 (agreeing that an injunction "would not only risk the lives" of Plaintiff's members but also "the risk of infections among their families, friends, co-workers, neighbors, and surrounding communities"). That is a risk the State cannot bear.

## CONCLUSION

This Court should deny Plaintiff's Motion for a Temporary Restraining Order. Instead, Plaintiff can raise these issues in its ongoing criminal and civil enforcement proceedings, where they properly belong. In the meantime, New Jersey must instead be allowed to continue evaluating its COVID-19 restrictions in a measured way as the constitution authorizes it to do.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY


By:   /s/ Daniel M. Vannella
      Daniel M. Vannella
      Assistant Attorney General (015922007)

Dated: June 16, 2020